**In the United States District Court
for the District of Kansas**

———————

Case No. 23-cv-02184-TC

———————

WESTERN FIRST AID & SAFETY, LLC,

*Plaintiff*

v.

ARAMARK UNIFORM & CAREER APPAREL, LLC,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Plaintiff Western First Aid & Safety, LLC, sued Aramark Uniform & Career Apparel, LLC, alleging breach of contract Doc. 46 at ¶ 4.a.i. The case proceeded to a bench trial, and the parties submitted post-trial proposed findings of fact and conclusions of law. Docs. 102 & 103. For the following reasons, judgment is entered in favor of Aramark.

**I**

**A**

Federal Rule of Civil Procedure 52 provides that actions may be tried to the bench. Fed. R. Civ. P. 52(a). In such cases the court must "find the facts specially and state its conclusions of law separately." *Id.* The following facts were found based on the evidence presented at the bench trial and in the parties' post-trial briefs. Docs. 91, 93, 94, 102, 103, 105, 106, 107, and 108.

**B**

This case revolves around the earnout provision of a sale of Western's assets to Aramark pursuant to a written contract. Western is a Kansas limited liability company whose business was the sale of

1

products like masks, gloves, and hand sanitizers. Aramark is a Delaware limited liability company. It sells a variety of uniforms and other products.

In September 2017, Western's owners, Jim Riggs, Rick Washburn, and Tom Lyons, signed an Asset Purchase Agreement with Aramark. Doc. 69-2.[1] The Agreement memorialized the sale of Western's assets to Aramark. In consideration, Aramark agreed to hire Riggs as Vice President of First Aid Services. It also agreed to pay Western a flat purchase price and an earnout. Whether Aramark properly paid the earnout is at the heart of this dispute.

Section 1.6 of the Agreement specified Aramark's obligation to pay the earnout. That section states as follows:

> (a) In addition to the portion of the Purchase Price payable at Closing, Buyer will pay additional amounts to Seller as follows (the "Earnout"):
>
> (1) For the period between September 30, 2017 and the end of Buyer's fiscal year on or about September 30, 2018 (the "Initial Year"), Buyer will pay to Seller ten percent (10%) of Buyer's total revenue reported on Buyer's internal financial statements ("Revenue") *from first aid and safety products supply and services operations* ("First Aid Operations") in excess of $3.0 million (excluding Revenue from First Aid Operations acquired from a prospective acquisition pursued by Buyer prior to the Closing); and
>
> (2) For each of Buyer's fiscal year periods ending on or about September 30, 2019, 2020, 2021, and 2022 (each "Subsequent Year"), Buyer will pay to Seller ten percent (10%) of Buyer's Revenue *from First Aid Operations* in excess of Buyer's Revenue from First Aid Operations in

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF. All facts are uncontroverted unless otherwise specified.

>> the prior Initial Year or Subsequent Year, as applicable.

Doc. 69-2 at 3–4 (emphasis added). Both parties agree that the Agreement calls for Aramark to make five earnout payments based on its yearly revenue from First Aid Operations. They further agree that the Agreement defined First Aid Operations, in material part, as follows: "first aid and safety products supply and services operations." *Id.* The crux of the dispute centers around which Aramark revenue counts as revenue from "first aid and safety products supply and services operations." *Id.*

Aramark made the 2018 and 2019 earnout payments without issue. It calculated its First Aid Operations revenue for 2018 by summing two categories of revenue: First Aid and Western First Aid. Aramark sent Western a notice that explained how it calculated the 2018 earnout. Doc. 69-7. Aramark used the same method to determine the 2019 earnout. Doc. 69-9. Western raised no objections to the 2018 and 2019 earnouts.

In early 2020, the COVID-19 pandemic struck the world. Because of the pandemic, Aramark saw substantial increased demand for masks, hand sanitizers, gloves, and similar products. Aramark began to track its sales of pandemic-related products because it recognized that those sales would not recur in subsequent years. Aramark's revenue from the sale of pandemic-related products was roughly $79 million in 2020, $14 million in 2021, and $1.4 million in 2022. Doc. 103 at ¶¶ 65, 89, 106. Aramark did not have similar sales prior to 2020.

Riggs, who was now working at Aramark after Western's sale, was responsible for an Aramark market center named WFA (MC302). This market center comprised the assets that Aramark had purchased from Western. When the COVID-19 pandemic broke out, Riggs began to help individuals outside of WFA (MC302) with their sales of pandemic-related products. Because of this, Riggs was familiar with Aramark's sales of pandemic-related products, whether those sales were facilitated by WFA (MC302) or not.

Aramark calculated the 2020 earnout as it had previously. Doc. 69-31. It excluded a portion of its 2020 pandemic-related sales from the earnout because it determined that those sales were not part of First Aid Operations. Western objected to the 2020 earnout calculations. The basis for its objection was that it believed revenue "related to PPE

safety supply and pandemic type items" should have been included in the revenue calculation and was not captured in either First Aid or Western First Aid. Doc. 69-32.

Aramark determined the 2021 earnout the same way. Doc. 69-35. But based on Western's objections to the 2020 earnout, Aramark issued revised earnouts for 2020 and 2021. Doc. 69-37. Those revised earnouts showed that Aramark understated its Western First Aid revenue for 2020 and 2021.[2] Aramark issued the 2022 earnout as it had the previous four years. Doc. 69-38. Western objected to that earnout, but Aramark did not revise it.

Western then filed suit in federal court. It brings one claim for breach of contract arguing that Aramark breached the Agreement "by not including in the FY2020-FY2022 Earnouts all revenue from PPE sales in FY2020-FY2022." Doc. 46 at ¶ 4.a.i. In particular, Western contends that "Aramark's total revenue from the sale of pandemic-related PPE was revenue from the sale of safety products and thus was Revenue from First Aid Operations within the meaning of Section 1.6(a)." Doc. 102 at 29. In other words, Western contends that Aramark engaged in a First Aid Operation each time that it sold a pandemic-related product. *See* Doc. 107 at 5.

Aramark does not dispute that pandemic-related items could be considered safety products or first aid products. Doc. 106 at 1. But it contends that the Agreement requires it to include revenue from certain operations, not from the sale of specific products. Doc. 103 at ¶¶ 20–23.

As noted earlier, the parties' dispute centers around which revenue should count as "first aid and safety products supply and services operations." Doc. 69-2 at 3–4. Western's position is that every sale of a pandemic-related product was necessarily a First Aid Operation. Put differently, that a sale was of a pandemic-related *product*, Western contends, is a sufficient condition to render that sale a First Aid Operation. Aramark, on the other hand, focuses on whether the sale stemmed

---

[2] Aramark understated its revenue from First Aid Operations in 2020 by roughly $4.5 million and in 2021 by roughly $5.4 million. Doc. 102 at ¶ 199. It revised its earnout obligations after correcting those errors. *Id.* at ¶¶ 199, 200. The precise cause of Aramark's error is unclear, but the parties agree that the error is unrelated to the current dispute.

from a supply and services operation, defining First Aid Operations as those which arose from the assets that Aramark bought from Western. In Aramark's view, the earnout is limited to revenue that Aramark earned because of its newly acquired Western assets. A bench trial was held, and the matter is ripe for decision.

## II

Western fails to show that Aramark breached the Agreement. Accordingly, judgment is rendered for Aramark. The following explains this conclusion.

### A

Resolution of Western's claim is guided by the text of section 1.6 of the Agreement. The parties agree that Delaware law governs the Agreement. Doc. 46 at ¶ 1.d. Thus, the Agreement is analyzed pursuant to that assumption. *See Digital Ally, Inc. v. Z3 Tech., LLC*, 754 F.3d 802, 812 (10th Cir. 2014). A federal court sitting in diversity must "apply the substantive law of the forum state." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014). That law arises from state statute and decisions of a state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *accord Berk v. Choy*, 607 U.S. __ , 2026 WL 135974, at *3 (2026). That means the decisions of the Delaware Supreme Court govern the legal analysis. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (citing *High Plains Nat. Gas Co. v. Warren Petroleum Co.*, 875 F.2d 284, 288 (10th Cir. 1989)). A federal district court must look to the Delaware Supreme Court's rulings, "and if no such rulings exist, [it] must endeavor to predict how the high court would rule." *Finstuen v. Crutcher*, 496 F.3d 1139, 1148 (10th Cir. 2007) (quoting *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 899 (10th Cir. 2006)).

The interpretation of a contract is a question of law. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 336 (Del. 2022). When interpreting a contract, a court must read it "as a whole and enforce

the plain meaning of clear and unambiguous language." [3] *Origis USA LLC v. Great Am. Ins. Co.*, 345 A.3d 936, 952 (Del. 2025). A contract must be read as a whole and in a manner that reconciles all its provisions. *Thompson St.*, 340 A.3d at 1167.

Applying the plain and unambiguous language of the Agreement compels judgment in favor of Aramark. As noted, Aramark was required to pay an earnout based on its revenue from "first aid and safety products supply and services operations." Doc. 69-2 at 3. This phrase can be deconstructed, and it appears that the parties agree on the result of doing so. Both parties agree that revenue from "first aid and safety products supply and services operations" denotes revenue from certain *operations*. Specifically, certain supply operations and certain services operations. More specifically still, supply operations of first aid and safety products and services operations of first aid and safety products. The evidence presented at the bench trial showed that Aramark paid the earnouts in the disputed years based on its revenue from those two operations, just as it had done in the years prior without issue.

Western's claim fails because it focuses on products rather than operations. In other words, Western takes the position that every sale of first aid and safety products counts as First Aid Operations. That contention is belied by the Agreement.

First Aid Operations is defined as "first aid and safety products supply and services operations." Doc. 69-2 at 3–4. The Agreement uses the phrase "first aid and safety products and services" only to refer to the subject of the sale: the assets that Western sold to Aramark. For example, section 1.1 notes that Aramark is purchasing the assets that Western uses to provide its customers with "first aid and safety products and services (collectively, the 'Assets')." Doc. 69-2 at 1. It further notes that Aramark is purchasing all of Western's contracts "relating to the provision of first aid and safety products and services (the

---

[3] Text is unambiguous when it is reasonably susceptible to only one interpretation. *Origis USA*, 345 A.3d at 952. And it is ambiguous when it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Thompson St. Cap. Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 340 A.3d 1151, 1166 (Del. 2025). Both parties agree that the Agreement is unambiguous and reject any suggestion to the contrary. As a result, neither side submitted any parol evidence or argues that such evidence is germane to the resolution of the dispute.

'Business')." *Id.* And section 2.5 notes that Aramark is buying all of Western's assets "necessary to provide first aid and safety products and services to [Western's customers]." Doc. 69-2 at 6. It follows then that the disputed phrase, "first aid and safety products supply and services operations," refers to operations related to the "first aid and safety products and services"—the Assets/Business—that Aramark bought from Western. *See* Antonin Scalia & Bryan A. Gardner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) [hereinafter *Reading Law*] ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning."); *accord Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 257–58 (Del. 2017) (discerning the meaning of a word in a contract provision based on how the word was used elsewhere in the contract, and concluding that there was no breach). This is precisely Aramark's position in this lawsuit, and it is how Aramark calculated the earnouts.

**B**

Western's counterarguments are unpersuasive. It argues that the negative-implication canon supports its position that all of Aramark's revenue from the sale of pandemic-related products—not just the revenue arising from the Agreement—must be considered, insofar as the language of section 1.6 is concerned, as revenue from First Aid Operations. Doc. 102 at 29; *see Reading Law*, at 107 ("The expression of one thing implies the exclusion of others . . . ."). Recall that section 1.6 excluded revenue from a previous acquisition by Aramark of a company named AmeriPride. Doc. 69-2 at 3. Western argues that the exclusion of AmeriPride from First Aid Operations shows that the parties' intent was "to include *all other* Revenue from First Aid Operations, regardless of the type of first aid and safety product or the market center that generates such Revenue from First Aid Operations." Doc. 102 at 28 (emphasis in original).

That point, even though true, does not convert pandemic-related revenue into First Aid Operations. The earnout provision does not call for payment based on the sale of first aid and safety products; the operative phrase is "first aid and safety products *supply and services operations.*" Doc. 69-2 at 3 (emphasis added). And the Agreement does not define a first aid and safety products supply operation as the sale of a first aid and safety product. Nor does it define a first aid and safety products services operation as the provision of any first aid and safety services. The parties were free to bargain for a contract that classified the sale of any first aid and safety product as a sufficient condition for

7

a first aid and safety products supply operation: They did not do so. As a result, that term cannot be inserted into the contract *ex post*. *See Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 355 (Del. 2020) ("[I]t is axiomatic that courts cannot rewrite contracts or supply omitted provisions. Doing so does not respect the parties' freedom of contract.").

Western's alternate theory of breach is unavailing. In particular, it argues that Aramark's categorization of pandemic-related sales improperly diverted revenue from the WFA (MC302) market center. Doc. 102 at 32. This argument fails for at least two reasons. For one, Western did not preserve this theory in the Pretrial Order. To the contrary, it has only claimed the breach was Aramark's failure to include all revenue from the sale of pandemic-related products in the earnout. Doc. 46 at ¶ 4.a.i. Western may not pursue a different theory of breach at trial. *See* Fed. R. Civ. P. 16(d) (noting that the pretrial order "controls the course of the action"); *accord Murphy-Sims v. Owners Ins. Co.*, 947 F.3d 628, 631 (10th Cir. 2020) (noting that "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint"). And for another, the evidence at the bench trial did not show that Aramark improperly diverted revenue from the WFA (MC302) market center to reduce its earnout obligations. Instead, the record demonstrated that Aramark merely recognized that the heightened demand for pandemic-related products was likely to be a non-recurring spike that was not a predictable part of its business operations.

### III

For the foregoing reasons, judgment is entered in favor of Aramark.

It is so ordered.

Date: February 23, 2026            s/ Toby Crouse
                                   Toby Crouse
                                   United States District Judge